Electronically Filed - Jackson - Kansas City - June 10, 2020 - 03:41 PM

## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
### SIXTEENTH JUDICIAL CIRCUIT

| | | |
|---|---|---|
| ADRIENNE JENSEN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Case No. |
| | ) | |
| UNITED STATES TENNIS | ) | |
| ASSOCIATION ("USTA"), | ) | |
| KANSAS CITY RACQUET | ) | |
| CLUB, | ) | |
| | ) | |
| Defendants. | ) | |

---

### COMPLAINT AND JURY DEMAND

---

Comes now plaintiff Adrienne Jensen, by counsel, and makes the following complaint for damages as a result of the sexual abuse she suffered at the hands of Rex Haultain, a United States Tennis Association certified coach and an employee or agent of the Kansas City Racquet Club.

### PARTIES

#### The Plaintiff

1.  Plaintiff is a current resident of the State of Iowa. She can be contacted via her counsel, Saeed and Little, LLP, 133 W. Market Street #189, Indianapolis, Indiana, 46204.

#### The Defendants

2.  Defendant United States Tennis Association ("USTA") is a New York corporation that can be served at 70 West Red Oak Lane, White Plains, New York, 10604.

3.  Defendant Kansas City Racquet Club ("KCRC") is a Kansas, with its principal place of business at 6501 Frontage Road, Merriam, Kansas 66202.  Upon information Defendant Kansas City Racquet Club was owned by Gold's Gym in 2010. Gold's Gym is head-quartered at

1

125 E. John Carpenter Fwy. Ste 1300 Irving, Texas 75062. Gold's operates fitness center across the United States including several in Missouri.

4.     Rex Haultain ("Coach Haultain"), during the events alleged below, was a resident of the State of Missouri.

## JURISDICTION AND VENUE

5.     This Court may exercise personal jurisdiction over Defendant KCRC because its agent, Coach Haultain, committed acts as alleged below in Missouri.

6.     This Court may exercise personal jurisdiction over Defendant USTA because this suit arises out of and relates to the USTA's contacts with Missouri. Defendant USTA controlled, supervised, and authorized the tennis programing and tournaments that Ms. Jensen participated in occurring in Missouri. Further, Defendant USTA certified Coach Haultain as a coach and he, as the agent of USTA, committed acts as alleged below in Missouri.

7.     Venue is proper in this Court because of the acts alleged below that occurred in Missouri.

## NATURE OF THE COMPLAINT AND FACTS

8.     Adrienne Jensen ("Ms. Jensen") began playing tennis when she was 3 or 4 years old.

9.     Ms. Jensen began playing in USTA tournaments at 8 years old.

10.     By 2009, at the age of 14, Ms. Jensen had become a nationally ranked player.

11.     Ms. Jensen had aspirations to play tennis in college and in the Olympics and other tournaments.

12.     The USTA is the National Governing Body ("NGB") for the sport of tennis in the United States.

13.     Membership in the USTA is required for those that wish to compete in the Olympic Games.

14.     The USTA is responsible for maintaining a national ranking of tennis players in the United States.

15.     A player's ranking is vital in determining if players are accepted into tournaments.

16.     USTA is responsible for certifying coaches in the United States.

17.     The United States Olympic Committee ("USOC") requires all NGBs, including the USTA, to train all its adult members, including coaches, officials, and umpires, on sexual abuse and sexual abuse prevention.

18.     The sexual abuse of minors by individuals in authority positions over them is a well-known problem in the United States.

19.     The calculated cover-ups by groups like the Catholic Church, Little League, and the Boy Scouts was national news for decades prior to 2010.

20.     Major media outlets have been reporting on sexual abuse in USOC-controlled NGBs, particularly United States Swimming and United States Gymnastics, since the early-1990s.

21.     By 2010, sexual abuse in sports controlled by the USOC was an undeniable epidemic.[1]

---

[1] USA Swimming was featured on ABC's 20/20 in early 2010
https://www.youtube.com/watch?v=GqmzMtp6iyw

22.     In 2010, the USOC commissioned a task force ("USOC Task Force") to prevent sexual abuse in sports controlled by the USOC and its NGBs.

23.     The leader of the USOC Task Force understood the importance of her work, telling <u>The New York Times</u> that sexual abuse of minors in NGB-controlled sports is a, "grass-roots problem" affecting "one million" kids. Lynn Zinser, U.S.O.C. to Take Steps to Protect Against Sexual Abuse, N.Y. TIMES, Sept. 28, 2010, at

https://www.nytimes.com/2010/09/29/sports/29usoc.html.

24.     The 2010 USOC Task Force suggested that the NGBs "implement new policies, safeguards, and protective practices within six months." *Id.*

25.     The then-CEO of the USOC, Scott Blackmon, believed that the USOC and its NGBs would implement the changes suggested by the Task Force within six months.

26.     The USOC Task Force recommended that the NGBs, including USTA:

    a.   Develop policies and procedures to define and prohibit sexual abuse;

    b.   Develop education training and programs for their adult members; and

    c.   Develop policies and procedures for minors to report sexual abuse.

27.     The USTA failed to implement any of the changes suggested by the Task Force.

28.     The USTA failed (apparently, to this date of this Complaint) to list their banned coach members publicly[2]. To the contrary, as of the date of this Complaint, the USTA still lists Coach Haultain as an award-winning contributor to the Youth High Performance Program.

---

[2] Buried on USTA's website one is able to search a coach's name to see if that coach is in compliance with USA Tennis' Safe Play program – but does not contain a list of banned coaches. https://www.usta.com/en/home/safe-play.html, the net result of listing coaches this way is that parents would have no  way of knowing that coaches like Rex Haultain banned from membership in United States Tennis – they would simply get a no results found when searching for his name in the Safe Play database.

29.     The USTA implemented a Safe Sport Program called "Safe Play" sometime in or after 2014.

30.     Upon information and belief, the USTA had no Safe Sport program until 2014.

**Defendants' Lack of Concern for Safety of Minor Members**

31.     By 2010, the KCRC should have had a policy requiring that its adult employees not be alone with children.

32.     In 2010, the USTA did not have a policy prohibiting its certified coaches from being alone with children.

33.     In 2010, the USTA did not have a policy prohibiting the coaches it certified from traveling alone with children to tournaments it sanctioned.

34.     In 2010, the KCRC did not have a policy prohibiting its adult employees from traveling alone to tournaments with children.

35.     In 2010, the USTA did not have a policy prohibiting its certified coaches from texting minor athletes.

36.     In 2010, the KCRC did not have a policy prohibiting its adult employees from sending texts, including sexually explicit texts, to its minor members.

37.     Coach Haultin was a USTA-certified coach and agent of the USTA at all relevant times.

38.     Coach Haultin was an employee or agent of the KCRC at all relevant times.

39.     Ms. Jensen was a member of both the USTA and the KCRC at all relevant times.

**Both Defendants Derived Financial and Other Value from Ms. Jensen's Membership**

40.     Ms. Jensen paid dues to the USTA.

41.     Ms. Jensen purchased insurance from the USTA.

42.     Ms. Jensen purchased specific insurance for sexual abuse from the USTA.

43.     Ms. Jensen paid membership fees and dues to the KCRC.

44.     Both Defendants benefitted from having an athlete of Ms. Jensen's caliber among their members.

**Due to Defendants' Lack of Care Coach Haultain Groomed and Molested Ms. Jensen**

45.     In August of 2009, Ms. Jensen moved to Kansas City to train with Coach Haultain, a renowned coach from New Zealand who was working for the KCRC.

46.     The coach-athlete relationship between Ms. Jensen and USTA-certified coach Haultain started off appropriately.

47.     Ms. Jensen thought highly of Coach Haultain and wanted to do whatever she could to please him.

48.     Coach Haultain was aware of how much Ms. Jensen looked up to him.

49.     Coach Haultain exploited her admiration and respect.

50.     Coach Haultain slowly and methodically groomed and manipulated Ms. Jensen.

51.     Coach Haultin began developing situations where he could be alone with Ms. Jensen.

52.     The KCRC allowed Coach Haultain to be alone with Ms. Jensen at its facility.

53.     The USTA allowed their certified coach, Rex Haultain, to be alone with Ms. Jensen at tournaments and competitions that the USTA sanctioned.

54.     Coach Haultain regularly took Ms. Jensen to facilities in Kansas City, Missouri and St. Louis, Missouri for training and to participate in tournaments.

55.     In 2009, Coach Haultain began texting Ms. Jensen. His texting occurred away from practice, often in the evenings. On information and belief, much or most of his texting occurred while he was at his residence or while otherwise in Missouri.

56.     Throughout 2010, these text messages increased in frequency.

57.     At first, the text messages came on holidays. Then, in 2010, Coach Haultain began texting more frequently and ultimately daily.

58.     The messages went from praising Ms. Jensen's tennis skills to praising her body and appearance.

59.     Coach Haultain said they (he and Ms. Jensen) would be together forever.

60.     Coach Haultain said he would take Ms. Jensen away to Mexico.

61.     Coach Haultain described his long-term fantasies and told Ms. Jensen he loved her.

62.     Coach Haultain made Ms. Jensen feel like she needed him, not just athletically, but emotionally as well.

63.     Ms. Jensen feared her performance would fall off if she stopped training with Coach Haultain.

64.     Coach Haultain sought out and cultivated a sexually exploitative "relationship" with the 15-year-old Ms. Jensen.[3]

65.     As this inappropriate behavior continued, every three weeks or so, they would have "The Talk".

---

[3] The use of the term "relationship" should not be interpreted as implying that Ms. Jensen was able to consent to having a sexual relationship as a minor.

66.  "The Talk" was Coach Haultain making increasing demands on her, not from her athletically, but from her sexually.

67.  Ms. Jensen understood this as a covert way of requesting nude photos, sexual favors, or to motivate Coach Haultain to send her photos of his penis.

68.  Coach Haultain solicited Ms. Jensen on numerous occasions to send him nude photos, as well as showing her photos of his penis.

69.  Ms. Jensen would sometimes oblige and send Coach Haultain photographs in her bra and underwear.

70.  Ms. Jensen felt immense pressure to please Coach Haultain, it affected her personal life, and performance on the court.

71.  Ms. Jensen felt the pressure building to engage in sexual acts with her coach after every text message, inappropriate action, and conversation with Coach Haultain.

72.  Coach Haultain continued to mentally break Ms. Jensen down. He would alternate between yelling at Ms. Jensen and then ignoring her. He would scream at Ms. Jensen, tell her she was pathetic, not good enough, and a disgrace before banishing her to a different court as a way of punishing her. Then, he would text her at night acting as if he had not spent the day verbally and emotionally abusing Ms. Jensen.

73.  Ms. Jensen felt the pressure building up from every text message and inappropriate action done by Coach Haultain.

74.  Coach Haultain also would take Ms. Jensen out of state by means of the Kansas City International Airport for tournaments.

75.  During a plane ride, on their way to Las Vegas, Nevada, in May of 2010, Coach Haultain put Ms. Jensen's hand on his penis while she pretended to be asleep.

76.     Ms. Jensen was mortified and took her hand away, however, he only took it again and placed it back onto his penis.

77.     In July of 2010, at a tournament in Alabama, Coach Haultain came into Ms. Jensen's hotel room to give her a back massage.

78.     Coach Haultain noticed Ms. Jensen had her sports bra on and telling her to go into the bathroom to take it off.

79.     After Coach Haultain continued to mentally break Ms. Jensen down, she had a breakdown on the court at practice in the summer of 2010.

80.     Coach Haultain complained that she was not ready for a relationship and he would stop trying.

81.     Coach Haultain would respond with anger and punish Ms. Jensen at practice when she would not engage with his sexual advances. He would yell at and verbally demean Ms. Jensen before sending her to a different court and refusing to speak to her. Ms. Jensen would have to approach and engage Haultain in order to reestablish communication and coaching.

82.     Coach Haultain did not stop trying to cultivate a sexual relationship with Ms. Jensen.

83.     Ms. Jensen did not want to play poorly for fear of how her coach would react.

84.     When Ms. Jensen did not perform as Coach Haultain expected, he would punish her with extra physical training and would be verbally abusive to her at practice.

85.     Ms. Jensen was trapped by Coach Haultain and subjected to his ongoing abuse because his coaching and connections in the tennis world were a vital component of her athletic success.

86.     During these summer months, Coach Haultain would punish Ms. Jensen if she wasn't playing as well as he thought she should; he would yell at her, demean her, put her on courts with players who were not at her level, and would tell her how "pitiful," "horrible," and "disgusting" her tennis was.

87.     After these terribly difficult days on the court during the practices in the summer of 2010, Coach Haultain would text her at nighttime, acting as though the verbal and emotional abuse on the court never occurred.

88.     Players who Ms. Jensen practiced with noticed the ways in which Coach Haultain treated her.

89.      One boy, even yelled at practice one afternoon, "Why is Rex so fixated with you?"

90.     Ms. Jensen remembers parents and other players staring at her and Coach Haultain.

91.     She did not want play poorly in fear of how he would treat her.

92.     Ms. Jensen continued to endure the abusive situation with Coach Haultain due to her confusion and to mitigate the verbal and emotional abuse she would endure on the court.

93.     On the way to St. Louis in the fall of 2010, Coach Haultain stroked her leg in the car.

94.     Ms. Jensen did not say anything because she did not want to upset him.

95.     When he was upset with her, Coach Haultain lashed out at Ms. Jensen, causing to her suffer serious mental and physical harm.

96.     The pressure to perform athletically and sexually for her coach was so bad that at tournament in St. Louis, Ms. Jensen's confidence was extremely low, her mental state was unwell, and she could not play tennis.

97.     Ms. Jensen could not play or focus because of the severe psychological stress that Coach Haultain subjected her to. Ms. Jensen was terrified of what she would have to endure off the court.

98.     Before Ms. Jensen's first match in St. Louis, Haultain demanded to know what color underwear she was wearing, the color of her pubic hair, and description of her breasts. Ms. Jensen, with tears in her eyes, could not even respond when the tournament director called her name.

99.     Ms. Jensen feared being on the court and being watched by Coach Haultain who also constantly told her she "wasn't good enough" and further feared being off the court and continually subjected to his sexual harassment and abuse.

100.    Coach Haultain later came to her hotel room and lay on her bed. Ms. Jensen had suicidal thoughts, she wanted to escape what had become reality.

101.    Ultimately, Ms. Jensen withdrew from the tournament after being up all night crying due to Haultain's abuse.

102.    In December 2010, while they were in Arizona for a tournament, Ms. Jensen was watching a movie in her room and Coach Haultain came and lay on her bed again.

103.    Coach Haultain began to hug Ms. Jensen tightly.

104.    Coach Haultain gradually became more sexual.

105.    Coach Haultain reached his hands in Ms. Jensen's pants.

106.    Coach Haultain began rubbing Ms. Jensen's buttocks and then her vagina.

107.    Coach Haultain told Ms. Jensen, "Just go with it," as Ms. Jensen cried.

108.    The next day, after her matches, Coach Haultian trapped Ms. Jensen in her hotel room.

109.    This time Coach Haultin went even further with her sexually.

110.    Ms. Jensen did not know how to tell him, "No."

111.    Ms. Jensen was afraid that Coach Haultain would seek physical and psychological retribution if she denied his sexual advances.

112.    Coach Haultain digitally penetrated Ms. Jensen's vagina.

113.    After their trip to Arizona in late 2010, Coach Haultain continued to pursue Ms. Jensen.

114.    Coach Haultain would talk to Ms. Jensen between matches in Arizona, making her promise that she would not tell anyone what he had done.

115.    Coach Haultain told Ms. Jensen he feared he would get caught, but he did not stop his inappropriate and criminal behavior with Ms. Jensen.

116.    Haultain told Ms. Jensen not to tell anyone about his behaviors because he did not want the tennis community to learn the truth about him.

117.    Coach Haultain told Ms. Jensen he wished she didn't see him as a father figure, and wished they were the same age.

118.    Coach Haultain got mad when Ms. Jensen went on dates with boys her age.

119.    Coach Haultain demanded Ms. Jensen buy different underwear and tell him what color she was wearing during practice so he would have something to think about.

120.     In August 2010, Haultain picked up Ms. Jensen and her sister from their apartment to travel to San Diego, CA, where Ms. Jensen would compete in Hard Court Nationals.

121.     While they were driving to Kansas City International Airport, Coach Haultain could show Ms. Jensen pictures of his penis, even with her sister was in the backseat of the car. Ms. Jensen felt helpless because her sister was in such close proximity during Haultain's graphic sexually inappropriate behavior.

122.     Coach Haultain often would tell Ms. Jensen that she made him "hard". In one instance, while at the tournament in San Diego, he made Ms. Jensen walk around the facility with him while he told her how "hard" she made him and whether she "was aware of what she did to him." Haultain's constant harassment and abuse made Ms. Jensen feel that it was her fault.

123.     Coach Haultain would beg Ms. Jensen to look at photos of his penis.

124.     Ms. Jensen would look at Coach Haultain's photos to appease his demands but would feel sick to her stomach that someone her dad's age was doing this.

125.     Coach Haultain's sexual, verbal, physical, and mental abuse continued until his arrest.

126.     After Coach Haultian's arrest and conviction, Ms. Jensen could no longer trust her coaches when she returned to the sport.

127.     Coach Haultain stole Ms. Jensen's time, happiness, mental health, passion for tennis, and her innocence.

128.     Ms. Jensen has experienced anxiety, depression, guilt, and mental anguish as the result of Coach Haultain's actions.

129. It was not until recently that Ms. Jensen began to connect her mental injuries to her abuse.

130. Coach Haultain pled guilty to one Federal Count of soliciting child pornography and was ultimately sentenced to prison and subsequently deported to New Zealand.[4]

## CLAIMS FOR RELIEF

### Count 1: Negligence
*Plaintiff v. USTA*

131. Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

132. The USTA had a duty to protect Adrienne Jensen, who was a paying member of the USTA, and all other minor members from sexual abuse, battery, harassment, and exploitation by USTA certified, member coaches, including Haultain.

133. The USTA breached this duty.

134. The USTA was negligent in its retention, supervision, endorsement, and credentialing of Rex Haultain and by failing to implement policies and procedures to prevent child sexual abuse.

135. As a direct and proximate result of the USTA's actions, Haultain sexually assaulted, molested, harassed, battered, and physically and emotionally abused Adrienne Jensen, a minor, resulting in severe emotional distress and economic losses, and these injuries continue.

### Count 2: Negligence
*Plaintiff v. KCRC*

136. Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

---

[4] https://archives.fbi.gov/archives/kansascity/press-releases/2013/girls-former-tennis-coach-sentenced-for-soliciting-her-for-child-pornography

137.    The KCRC had a duty to protect Adrienne Jensen, who was a paying member of the KCRC, and all other minor athletes using their facility from sexual abuse, battery, harassment, and exploitation by Rex Haultain, the agent and/or employee of KCRC.

138.    The KCRC breached this duty.

139.    The KCRC was negligent in its retention, supervision, endorsement, and credentialing of Rex Haultain and by failing to implement policies and procedures to prevent child sexual abuse.

140.    As a direct and proximate result of the KCRC's actions, Haultain sexually assaulted, molested, harassed, battered, and physically and emotionally abused Adrienne Jensen, a minor, resulting in severe emotional distress and economic losses, and these injuries continue.

**Count 3: Forced Labor in Violation of 18 U.S.C. § 1589(b), § 1595(a), § 2255**
*Plaintiff v. USTA and KCRC*

141.    Ms. Jensen incorporates the foregoing paragraphs as though fully reproduced herein.

142.    Section 2255 of the Trafficking Victims Protection Act ("TVPA") creates civil liability for those who commit or benefit from forced labor or services or sex trafficking and trafficking-related offenses, including those offenses enumerated in 18 U.S.C. §§ 1589, 1595(a).

143.    In violation of 18 U.S.C. §§ 1589 and 1595(a), the KCRC and the USTA, through their employee, agent, and certified coach, Rex Haultain, knowingly benefitted from participation in a venture with Rex Haultain, knowing or in reckless disregard of the fact that the venture was engaged in the providing or obtaining Ms. Jensen's labor or services by means of force, threats of force, physical restraint, threats of physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Ms. Jensen to believe that, if

that she did not perform such labor or services, she would suffer serious harm or physical restraint.

144.    The USTA benefitted when Ms. Jensen paid to be a part of the USTA and paid to attend tournaments sanctioned by the USTA, including tournaments in St. Louis Missouri and other locations, where Haultain her USTA-certified coach, sexually harassed and assaulted her.

145.    The KCRC benefitted when Ms. Jensen paid to be a member and utilize the KCRC and gained prestige and enhanced their reputation by having Ms. Jensen participate in national tournaments sanctioned by the USTA.

146.    The KCRC enhanced their reputation and prestige as their members improved their national rankings.

147.    In 2010, the USTA failed to take any action to ensure the safety of Ms. Jensen (or for that matter, any minor athlete) at their sanctioned tournaments.

148.    Each of the Defendants benefitted financially and/or received something of value from the exploitation, forced labor and services, and sex trafficking of Ms. Jensen.

149.    As a direct and proximate result of the actions of Defendants, Ms. Jensen has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.


**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully prays for the following relief:

a.    That judgment be entered in favor of Plaintiff and against Defendants;

b.    That Plaintiff be awarded damages in such amounts as fairly compensates her for injuries;

c. That Plaintiff be awarded pre-judgment and post-judgment interest;

d. That Plaintiff be awarded her actual expenses of litigation, including reasonable attorney's fees;

e. Injunctive relief, requiring the USTA to put in place supervision and compliance protocols that actually prevent, uncover, and stop the disregard of the safety of athletes, minors, and their families; and

f. That Plaintiff be awarded such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a jury trial in this matter.

Respectfully submitted:

DRZ LAW, LLC

/s/ Chris Dove
Christopher Dove       MO #64641
8700 State Line, Suite 305
Leawood, KS 66206
913-400-2033
chris@drzlawfirm.com

Jonathan Little (pro-hac pending)
Derrick Morgan (*pro hac* pending)
Jessica Wegg (pro-hac pending)
Saeed and Little, LLP
133 W. Market St., #189
Indianapolis, IN 46204
317-721-9214
derrick@sllawfirm.com
jon@sllawfirm.com
annie@sllawfirm.com

Brian Cornwall (*pro hac* pending)
Cornwall and Stevens
317 W. York Street
Savanah, Georgia 31401
(912) 417-4597
bcornwell@cornwellstevens.com

ATTORNEYS FOR PLAINTIFF



IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>JAMES DALE YOUNGS | Case Number: 2016-CV13141 |
|---|---|
| Plaintiff/Petitioner:<br>ADRIENNE JENSEN | Plaintiff's/Petitioner's Attorney/Address<br>CHRISTOPHER STEVEN DOVE<br>DRZ LAW, LLC<br>9229 WARD PARKWAY, SUITE 370<br>vs. KANSAS CITY, MO 64114 |
| Defendant/Respondent:<br>UNITED STATES TENNIS ASSOCIATION | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Pers Injury-Other | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:** UNITED STATES TENNIS ASSOCIATION
Alias:

**70 WEST RED OAK LANE**
**WHITE PLAINS, NY 10604**

# PRIVATE PROCESS SERVER

*COURT SEAL OF*



*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

24-JUN-2020
Date                                          Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____                    _____
Printed Name of Sheriff or Server                    Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*            Subscribed and sworn to before me on _____ (date).

My commission expires: _____            _____
                                              Date                                          Notary Public

| **Sheriff's Fees** | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $ 10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org  →  Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

Revised 7/3/13                    Service Information - Attorney

**AFFIDAVIT OF SERVICE**

State of Missouri        County of JACKSON        Circuit Court

Case Number: 2016-CV13141

Plaintiff:
**ADRIENNE JENSEN**
vs.
Defendant:
**UNITED STATES TENNIS ASSOCIATION ET AL**

For: DRZ LAW

Received by D & B Legal Services, Inc. on the 24th day of June, 2020 at 12:31 pm to be served on **UNITED STATES TENNIS ASSOCIATION, 70 WEST RED OAK LANE, WHITE PLAINS, NY 10604.** I, _Adrian De Carlo_ being duly sworn, depose and say that on the _20_ day of _July_, 2020 at _12:38_ _p_.m., executed service by delivering a true copy of the **Summon in Civil Case, Complaint and Jury Demand and Notice of Case Management Conference for Civil Case and Order for Mediation** in accordance with state statutes in the manner marked below:

[X] CORPORATE SERVICE: By serving _Kwame Afrioiye_ as _Facility Associate_

( ) CORPORATE SERVICE AT ALTERNATE ADDRESS: By serving _____ as _____ at the alternate address of _____

( ) PUBLIC AGENCY: By serving _____ as _____ of the within-named agency.

( ) NON SERVICE: For the reason detailed in the Comments below.

COMMENTS: _____
_____
_____
_____

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

Subscribed and Sworn to before me on the _10th_ day of
_July_ _2020_ by the affiant who is personally
known to me.

_Lisa Russak_
NOTARY PUBLIC

LISA RUSSAK
Notary Public, State of New York
No. 01RU6186114
Qualified in Putnam County
Commission Expires Apr. 28, 20 24

PROCESS SERVER # _N/A_
Appointed in accordance with State Statutes

**D & B Legal Services, Inc.**
P.O. Box 7471
Overland Park, KS 66207
(913) 362-8110

Our Job Serial Number: 2020005398

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.1c

Electronically Filed - Jackson - Kansas City - July 21, 2020 - 01:10 PM



IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>JAMES DALE YOUNGS | Case Number: 2016-CV13141 |
|---|---|
| Plaintiff/Petitioner:<br>ADRIENNE JENSEN | Plaintiff's/Petitioner's Attorney/Address<br>CHRISTOPHER STEVEN DOVE<br>DRZ LAW, LLC<br>9229 WARD PARKWAY, SUTIE 370<br>KANSAS CITY, MO 64114 |
| vs. | |
| Defendant/Respondent:<br>UNITED STATES TENNIS ASSOCIATION | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Pers Injury-Other | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:** UNITED STATES TENNIS ASSOCIATION
Alias:

70 WEST RED OAK LANE
WHITE PLAINS, NY 10604

# PRIVATE PROCESS SERVER

*COURT SEAL OF*

*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

24-JUN-2020
Date

Clerk

Further Information:

---

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
_____ (name) _____ (title).
☐ other _____

Served at _____ (address)
in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____      _____
Printed Name of Sheriff or Server      Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*

Subscribed and sworn to before me on _____ (date).

My commission expires: _____      _____
Date      Notary Public

| Sheriff's Fees | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $ 10.00 |
| Mileage | $_____ (_____ miles @ $_____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on each Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (7/2018) SM30 (JAKSMCC) *For Court Use Only:* Document Id # 20-SMCC-5154  1 of 1 Civil Procedure Form No. 1, Rules 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4:20-cv-00610-DGK   Document 1-1   Filed 07/31/20   Page 22 of 22